Good morning, Your Honor. My name is Bruce Locke. I am representing one of the four defendants that we call the Dodge Intrepid Four, the people who were located in the automobile. I'm going to address the search, the arrest and search issue and the Rule 29 issue. Ms. Luban is going to address the Bruton issue and Mr. Halton is going to address the Shackling issue. Okay. How are you allocated your time? Five minutes, five minutes, five minutes and reserve five minutes. All right. Thank you. With respect to the arrest of the individual Excuse me. I'm going to ask the deputy to reset the clock for 20 minutes because we want to be sure this, we get, everyone has a chance to comment today. Go ahead. Thank you, Your Honor. With respect to the arrest of the individuals in the Dodge Intrepid, the government, we believe, is establishing probable cause by guilt by association. The government, the police officers knew certain facts at the time that they arrested the individuals in the Dodge Intrepid. They knew that a man by the name of Emanuel Valle and his two associates were committing various drug crimes. They knew that they had seen the Dodge Intrepid the day before the drug transaction in a parking lot where they had also seen Emanuel Valle. They knew the day of the drug transaction, they saw the Dodge Intrepid driving around the neighborhood where the drug transaction was taking place. And they knew that after the drug transaction had taken place and Mr. Valle had left the parking lot, the Dodge Intrepid drove into the parking lot and then followed the same route from the parking lot, eventually catching up with Mr. Valle and falling in behind him. At that point, the police arrested, stopped the Green Dodge Intrepid and arrested the occupants of the Green Dodge Intrepid and then conducted an immediate search of the Green Dodge Intrepid. And what about the evidence of this counter surveillance? Well, there is no evidence that they were actually counter surveilling anything. There's no evidence that they were ever in a position to see the drug transaction and there's no evidence that they ever stopped to look at anything or did anything. They're just driving around the neighborhood. There is evidence that at the exact time that the drug transaction is taking place, which is shortly before 9 a.m. and it concludes at 9.15 a.m., at 9.04 a.m., the Dodge Intrepid people stop at a liquor store and one guy goes in and buys Cokes and comes back out to get back in the car and drive off. That's all that there is. Never in a position to see the drug transaction and they never actually do anything. They're just driving in the neighborhood. After the drug transaction, the evidence says they went exactly to the spot where the drug transaction took place. They went to the parking lot, that's right, and the police testified they stopped at exactly that spot. And then they drove to the freeway. That's right. They got on the freeway and hooked up with the other two cars. Right. They drove north the same route. Right. Fall in behind them 20 minutes later and continue following them. Why can't we take all of that into account? Well, I think you do take it into account, but all it amounts up to is being next to somebody or being close to somebody. If Mr. Talbot and I are walking down the street and I stop to buy drugs and Mr. Talbot's standing there, I buy the drugs and then we continue walking down the street, Mr. Talbot is not a criminal. He has not participated in any crime. He's not done anything. He is just next to somebody who is committing a crime. How about the telephone calls showing there's some cooperative association here more than just being next to someone that's committing a crime? Well, the telephone calls only come into play after the search because they don't know about the phone calls until after the search. So the phone calls and the existence of the guns in the automobile are the two facts that would go to the Rule 29. Those are two additional facts that the jury could have relied on to determine guilt. But as of the time of the search, all they know is the car was near Mr. Valle the day before, was near the transaction on the day, and then followed and was near Mr. Valle at the time of the arrests. They're just near. They don't actually do anything. Is there any explanation as to why they were near? No, and I think that would be reversing the burden of proof, Your Honor, to make us explain why we're there. Our defendants have a right to be there. They have a right to be somewhere. They have a right to be somewhere. They have a right to be anywhere. It could be that they were told to get lost because Mr. Valle had some business to do and, you know, get lost and I'll call you when we're done. Which would be perfectly legal and have a perfectly innocent explanation for this. And so with respect to the search, there is no activity that would indicate that these men are involved in committing a crime. What's wrong with a reasonable officer saying that this is more than a coincidence that they happen to be in the same place at the same time? I think a reasonable officer could say I have a suspicion, Your Honor, that these people are involved and he could have made a Terry stop of the Green Dodge Intrepid and he could have asked them what in the world are you doing here? And that might have generated probable cause to search the vehicle or to arrest the individuals. They didn't do that. They didn't ask any questions. They just arrested them. And our point is, at that point in time, they did not have probable cause because a reasonable police officer could not conclude that these men had committed a crime at that point in time. Counsel, you've gone over five minutes. I know. I appreciate it. Very good. I'm Suzanne Luban, Your Honors, and I'd like to address the brutal argument I represent to Mateo Valle. This Court reviews Confrontation Clause Claims, de novo. The use of the plural pronouns in the confessions of the two men, Mr. Barrera-Medina and Mr. Hernandez, function the same as the symbols, the blanks or the X in Gray v. Maryland, which Gray v. Maryland's Supreme Court held functioned the same as using the person's name in Bruton. Okay, but here there was redaction and there was no specific reference to any of the other defendants. Is that right? That's right, and that's the same situation in Gray v. Maryland. There's no specific reference to the specific defendants by name or description in Gray v. Maryland. In fact, in Gray v. Maryland, it's more ambiguous because they used two blanks or two Xs, but there were two spaces and there was only one defendant at trial in Gray, whereas in our case there's the ambiguous all-inclusive or potentially all-inclusive we, they. We plan to drop you. We plan to, you know, we were going to rob you. Our plan was to take you to the motel room and tie you up. And then they didn't intend, Robles asks, if they intended to kill him. And I think it's aware of, you know. What would you do with this? Well, the government's theory in their briefs, which is the same theory under which the district court ruled to allow these pronouns, is to say, the judge said, well, the proper or normal interpretation of this is that it's the speaker and Manuel Valle, that Manuel Valle and Mr. Barrera-Medina are we. But the only big problem with that, which is that Barrera-Medina is with Manuel Valle and Lino Hernandez is with Manuel Valle. And they all tell the same, both of those two men tell the same story about we got a hotel room and we came to Sacramento. So clearly it cannot be we can only be two people. The minimum we can be three people. And there's no reason, it's speculation that it's really just those three people or it's just two people. It's just the same. A pronoun is a symbol. In language, a pronoun is a symbol. And that's what Gray v. Maryland and Bruton forbid, the use of a symbol or the use of the person's name. They say it's a functional equivalent of the use of the defendant's name in Bruton. So where the government argues that the proper interpretation of this, that's not an appropriate standard to review these by. It's whether there is any reference to the existence of unnamed co-conspirators. That's the rule in Gray v. Maryland that interprets the rule in Bruton. And this is not a Richardson v. Marsh case. In Richardson v. Marsh, the reference to the person is completely eliminated. There's no reference at all. So to answer your question, the proper redaction is the plan of Manuel Valle and me or, you know, my plan and Manuel's plan, and Manuel and I plan to drop you and Manuel and I plan to tie you up. If that's really what the government's theory is on the statement, then that's how they should have redacted it. Or I plan to drop you and I plan to tie you up or Manuel planned to drop you and tie you up, but certainly not the group. And the problem, this is clearly not harmless beyond a reasonable doubt. In this case, and it's argued extensively in the section regarding Rule 29, there is not sufficient evidence that's unambiguous. There's no evidence of intent of these young men, the four young men in the car. They are floating around the area. They are getting a drink when it would be actually a crucial time for them to be watching the parking lot if they're truly providing counter-surveillance. So there's ambiguous conduct, perhaps, that they're floating around the area and they're present, but there's no evidence other than these statements of intent on their part, of direct intent. And these statements from two different people, and one of them repeats several different times different things that we are going to do. So it's all throughout his statement, it's not just one reference, that links in this group. And that is really the only evidence that the government had at trial that attributed specific intent to these individuals. Thank you. Thank you, Your Honor. Mr. Haltom. May it please the Court and Counsel, I'm Victor Haltom and I represent Mr. Barrera-Medina. I'm going to address the shackling issue. The problem with the shackling issue in this case is that if a shackling order like this can be upheld at the appellate level, then the constitutional prohibition against shackling has no teeth whatsoever. It can simply be circumvented by a district court judge taking measures to endeavor to prevent a jury from being able to perceive that all the defendants are shackled in this case. What's the evidence that the jury saw anything of shackling here? There is no evidence that the jury saw any. Isn't that a relevant consideration? It is germane to the prejudice inquiry in this case. But there are, as this Court has noted in its cases and as the U.S. Supreme Court has noted, shackling is inherently prejudicial. And it's inherently prejudicial not just because of the potential impact on the jury's perception of the defendants, but on the defendants' ability to communicate and interact with counsel and a number of other considerations. Here, in this case, as one of the trial attorneys noted at the very beginning of the trial when the judge was addressing this subject, Your Honor, it seems as though you're treating this as a foregone conclusion, that these men need to be shackled. And here there was absolutely no evidence of any need to shackle these men. None of these defendants, the six defendants, had attempted to escape. None had engaged in any disruptive courtroom behavior, nothing whatsoever. The district court judge did. All he could say was that I received word from one of the deputy marshals or courtroom personnel that one of the defendants at one point in time was refusing to dress out. That's it. So there's – if we look at all of the law pertaining to when a district court may order defendants to be restrained in the courtroom setting, none of that justifies what the district court judge did here. Were all of the defendants shackled? All of them were, yes, Your Honor. And it was a system that was sort of novel. It was a bucket of – Airplane wire and a bucket of concrete. Right, right. The government, in its brief – to me, the error is fairly clear here. Excuse me. Back up for one second. Where did the notion about shackling originate? Are you suggesting it came from the judge based on this comment by the deputy, or was this a government request? Where did it come from? You start reading page one of the trial transcript when the parties are addressing in limine matters, and I think it's the second issue the judge brought up. He dealt with some housekeeping matters, and the second main issue he brought up was I've got some security concerns here, and he pointed out, well, they were arrested with firearms and they were threatening to commit a robbery in the course of the underlying criminal conduct. So I've got some security concerns. We've got six defendants, limited, I guess, space in the courtroom. I need to do something as a district court judge to secure the courtroom. And so rather than load up the courtroom with marshals, I'm going to use this innovative shackling system with six defendants. Where did he cross the line? If he has this concern, what's the test here? What's our constitutional test here? The test, the first test is that there has to be a demonstrable need to impose the physical restraints, and that test is not satisfied here. The court, this Court's precedent says that demonstrable need needs to be disruptive courtroom behavior, escape attempts, some type of outbursts by the defendant, credible threats by the defendant. If we agree with you that it was unnecessary, why would that automatically transfer into a reversal here when it's been stated that it didn't affect the defense of the case? Well, I certainly don't concede that it didn't affect the defense in the case you're on. Nothing on the briefs indicated that it had any inhibition in your putting on a case. That's right. And it's the government's burden of proof under the harmless error standard under Chapman to show beyond a reasonable doubt that this did not prejudice the defense. All the government says in that regard is, well, we don't think that the jury saw this. Maybe they caught a glimpse of it. The government doesn't rule out that possibility, and the government doesn't address the other possible types of prejudice that may have been occasioned by the utilization of these restraints. There's nothing in the briefs that leads you to the conclusion, even if we agree with you that shackling was unnecessary, that it impacted the trial of the case anyway. That's correct. I offer this Court now, and I offered the Court in my briefing, no proof that it caused prejudice, but that's the argument. Are you arguing it's inherently prejudicial? My argument is twofold. Number one, that it is, yes, it's inherently prejudicial, and the U.S. Supreme Court has said that in Holbrook, which I cited in my brief, and this Court has said it in Spain v. Russian. So as a starting point, it's inherently prejudicial. And secondly, the government has the burden of proving that it did not prejudice the defendants in this particular case, and the government hasn't even started to meet that burden. And finally, I'm arguing that in this case, because it was such a flagrant violation, there was just no need for the imposition of restraints that I'm asking this Court to invoke its supervisory powers, and I've cited U.S. Supreme Court authority in support of that. We've got about four minutes for your side. Thank you, counsel. We'll hear from the government. Thank you, Your Honor. May it please the Court, my name is Phil Talbert. I'm an assistant United States attorney in the Eastern District of California in Sacramento. I'll address the leg restraint shackling issue first. First off, this is not a case like the shackling cases, the line of cases that have been cited in the briefs. In this, there are leg restraints that were invisible and unheard to the jury. There's no allegation whatsoever. I'm not sure how we can prove the absence of something that hasn't even been alleged here. Well, they can see the jury didn't see them. Now, what is the need from your point of view? The district court went into an assessment under the Collins case, the two-part test of the compelling need and the less restrictive alternatives. The district court put on the record his concerns about the number of defendants on trial. There were six defendants on trial in a fairly small courtroom. The number of court security personnel that would be required if there were no shackles or leg restraints or any other type of restraints used would impact, in his view, the way the jurors might view these defendants who enjoy the presumption of innocence. The district court also noted that the defendants had been arrested in association with three loaded handguns in connection with a major drug transaction. So those were the things that the district court said started him on the road of considering different alternatives. Every time someone's arrested with a loaded gun, shackled during trial? No, Your Honor. In particular, a single defendant wouldn't raise the types of concerns. I think here it was the confluence and mainly the fact that there were six defendants here and the need for that many personnel in a small space. So what the judge tried to do was to consider different alternatives, including the use of taser guns and additional courtroom personnel, and decided on one that was very limited in its restrictiveness. Now, the government's position is that was not error. The judge followed the Collins case, did the two-step process. Even if it is error, there's no indication that any of the factors that the shackling cases indicate that make shackling prejudicial were present here. No allegation the jurors saw or heard, no allegation that the defendant's mental abilities were affected in some way or experienced pain or that there was any difficulty communicating with counsel. In fact, the district court may be put on the record that he had put the leg restraint on himself and made sure that there was sufficient movement that the defendant could move around, could consult with counsel who was seated next to the defendant. And, in fact, when the district court originally announced his intention to do this arrangement, there was an objection that at one point the defendants would not be seated individually next to their attorneys during jury selection, and the district court changed the plan so that each of the defendants could be next to his attorney during jury selection and just decided on putting potential jurors, not putting potential jurors in a couple of particular rows where they might possibly see the restraints. So here the district court went through all the alternatives. There's no claim of prejudice. With respect to the Bruton issue, Bruton is an exception to the general rule that jurors are presumed to follow the instructions that are given them. Here there was a limiting instruction given. The exception in Bruton, according to the Supreme Court in Richardson v. Marsh, is for statements that on their face powerfully incriminate the defendant. Here when you read the statement, each of the speaking defendants, this is Elias Medina and Lino Hernandez individually, each of the speaking defendants starts out his statement to the undercover officer who is interviewing him after arrest by saying how he knows Manuel Valle, how he was recruited by Manuel Valle to come and do this, and then the indication of we did this, we planned this, we did that. The government argues that the natural construction here of the pronoun we is the speaking defendant and Manuel Valle. There is no implication that there are others involved in the offense from the perspective of the speaking defendant. So this is unlike the gravy Maryland line of cases where there is a myself, blank, and some other people committed the offense, and the jurors are left to fill in the blank, and the blank is someone who is seated at counsel table along with the speaking defendant. Why isn't that true here? Because the pronoun we is can be construed, and we would argue the natural construction is Manuel Valle and myself. And so in that way, this case is much more close to Richardson v. Marsh, where the speaking defendant talked about how he was in a car with a person, a co-conspirator, who was not on trial. The speaking defendant didn't say no one else is in the car. It just talked about the other person in the car and themself. And it's only The we in this context refers only to a maximum of two people? We could refer to more people, but the natural construction is two people. And under Richardson v. Marsh, we just look at the confession. We don't look at all of the other evidence in the trial. The suggested redaction that defense counsel would have would create positive evidence on behalf of the intrepid defendants. It would take the neutral we and say Manuel Valle and I did this, Manuel Valle and I did that, allowing the intrepid defendants to argue, well, we weren't included in that statement, therefore we weren't in this. The government's argument here is that the jurors would still have to connect the intrepid defendants and still have to believe that the four intrepid defendants were participants in the crime to even believe that the confessions or the post-arrest statements of these two other defendants incriminated the intrepid defendants. So it's only through the other evidence that the government put on that the intrepid defendants were participants in the criminal activity that there was any inculpation at all whatsoever possible. And here the limiting instruction was given by the court, and so the Bruton rule does not apply. And in addition to that, even if this was a small part of the trial, there was substantial evidence of the intrepid defendants' participation in the crime if the jurors believed that the intrepid defendants were at all incriminated by the post-arrest statements of the two other defendants, then that means that they were already believing the intrepid defendants were participants in the crime. Turning to the motion to suppress, there are a few points that ‑‑ I won't go through each of the pieces of evidence that the brief lays out, which we believe under the case law should be considered in their totality to decide whether there was either probable cause or reasonable suspicion to stop the intrepid and to conduct the either search of the intrepid or the sweep for guns, depending on whether it's the probable cause or reasonable suspicion standard. But let me go through some of the characterizations of the facts the defendants have put forward in their briefs and at oral argument. One is that the defendants were just driving aimlessly. Here the record reflected the testimony of several officers was that prior to the deal, the Dodge intrepid was seen driving through a shopping mall, which was near the site of the eventual transaction, stopping, going out of the shopping mall, driving on a main boulevard, taking a U‑turn, coming back over a highway, taking a left, driving up into a residential neighborhood, taking another left, driving down a cul-de‑sac, turning around, coming back, and eventually stopping at a liquor store parking lot near the transaction. The driving around aimlessly is counter to what the agents, the trained and experienced law enforcement agents on the scene believed the intrepid was doing. They believed that the intrepid was conducting counter‑surveillance. The driving was consistent with what they understood as the need for or possible need for counter‑surveillance by drug traffickers in a major drug transaction. There's an argument that if they were really doing counter‑surveillance, they would have followed the Lincoln Navigator when the undercover officer took it from Lino Hernandez and went to fill it with almost a million pseudoephedrine pills. The government would argue that that's not necessarily what any counter‑surveillance or criminals conducting counter‑surveillance would be doing. The need for counter‑surveillance is with respect to the drugs and the money. That transaction was going to take place at the Super 8 and Denny's parking lot, so there was no need for the intrepid to follow a navigator. Maybe the drug traffickers lose the navigator, but that's of much lower value than what they had planned on acquiring, which was over $200,000 worth of pseudoephedrine pills. There's an argument that the defendants in the intrepid took a beverage break at a key time during the transaction. Actually, as the facts bear out, the transaction, which was shown on videotape to the jury, was very short, where there was the transfer of the pseudoephedrine pills loaded in the Lincoln Navigator to Manuel Valle and Elias Medina and Lino Hernandez in exchange for the backpack full of the wrapped money. The intrepid was at the liquor store parking lot. Officers lost sight of it. And then immediately after the pseudoephedrine transaction occurred and the vehicles left the parking lot, the intrepid was seen driving into the parking lot. So the intrepid couldn't have been that far away. It was not at the liquor store parking lot, definitely, and it couldn't have been that far away. It had to be very close to the transaction at the time it occurred in order for it to be there just after. The fact or the assumption by the defense that the intrepid was not within an easy view or close view of the transaction site, even if that were true, it's not necessarily determinative with respect to the counter-surveillance purpose here, because the defendants had, and this goes more to the sufficiency claim, this is similar issues with both. Probable cause. We're talking probable cause at this stage. Yes. The intrepid defendants had cell phones. Yeah, but at the time of the stop, nobody knew about the cell phones, right? Well, in fact, they did know that the driver of the intrepid had a cell phone because one of the officers testified that he saw the driver of the intrepid on his cell phone at the time they passed through the parking lot. And they knew that at least Lino Hernandez had a cell phone because he used it along with the undercover to speak to Manuel Valle at the time that Lino Hernandez provided the Lincoln Navigator to the undercover to go fill with pseudoephedrine pills. The defendants in their brief site cases where the alleged counter-surveillance defendants were not present or near the transaction at the time of the transaction and didn't have cell phones and guns, and I think those are distinguishable on those facts. Also here, the idea that the intrepid defendants were just hanging around while this was taking place is also belied by the sighting of the intrepid the day before. If this is just some casual acquaintance waiting for Manuel Valle to do some business and then heading north together, then the fact that the officers saw the intrepid coming out of a parking lot where the Lincoln Navigator went following the meeting at the Mexican restaurant where they set up the deal, there's a definite connection here between the intrepid, the Navigator, and the Concord the day before the deal. And that was important because as the undercover officer, Sal Robles, testified at trial, Manuel Valle and Lino Hernandez tried to convince him to do the drug transaction on the 9th that afternoon. So the intrepid was available at that time. I'd like to briefly address the claim in the brief that Blakely and Ameling should control this case. Before you do that, are you going to address the issue whether Hernandez should be should have gotten a Rule 29 motion granted as to the cocaine distribution? Count six. Yes, I can address that, Your Honor. The cocaine was not a stand-alone transaction. Here the charge was the sample of cocaine. It was a very small amount. Sample of cocaine that was provided in the context of negotiations between, on the one hand, Manuel Valle and Lino Hernandez, and on the other hand, Sal Robles acting undercover, for a large pseudoephedrine transaction in which Manuel Valle had indicated that he could sell cocaine and there was an initial agreement at that time that part of the payment for the million-plus pseudoephedrine pills would be in two kilograms of cocaine. And so the sample was provided in that context. If this was just a simple transaction between The evidence that the cocaine went to buy the pseudo, I can never pronounce it right, pseudoephedrine? That was actually, ultimately it didn't happen. But the Where's the evidence that That it was discussed Yes, I remember the evidence. The agent was after the pills, and Valle thought he might buy the pills and sell the cocaine, but I never found anything that said that part of the payment for the pills would be the cocaine. Perhaps you could cite me to that. I believe that's in the testimony of the undercover when he describes the discussion. So I ordered two kilos of cocaine in exchange for some of the pseudoephedrine pills. At the Mexican restaurant when the deal was being negotiated. So this was the count six, that cocaine was all within the context of this deal that was being negotiated between Manuel Valle and Lino Hernandez and Sal Robles. The fact that Manuel Valle took, I guess, a leading role in the negotiations doesn't dispel Lino Hernandez's participation in this deal and aiding and abetting the deal. But all he did was say, don't use it all at one time or something like that. He did make that comment, and the government argued that that showed knowledge on his part, consistent and helped tie that cocaine to the two kilograms of cocaine that had been negotiated between the parties at the restaurant. So you say the cocaine deal is sort of like swept into the rest of the transaction. Yes. It's part and parcel of it because it was negotiated as part of that transaction and the sample related to this transaction, which was supposed to occur the next day. With respect to Blakely and Ameline, the government argues that those cases simply are not implicated by this case. Maybe as to the intrepid defendants, but what about Hernandez and Barrera-Medina? Well, I think the only argument that's been raised has been by the intrepid defendants, so I'm not sure I can respond to an argument that might be raised by the other two defendants. The intrepid defendants are arguing against a jury's special verdict that is very specific on this point that found that each of the defendants individually conspired with respect to over 50 grams of meth and over 500 grams of meth mixture. To the extent the defense argues that that special verdict, the language of it, doesn't include reasonable foreseeability, the government's position is that this case is not a relevant conduct case. This is one where if the intrepid defendants are responsible for the million pills of pseudoephedrine, it's by their direct involvement in the transaction as counter surveillance and security, which is amply supported by the jury's verdict of guilty against all defendants. Unless the Court has other questions. No further questions. Thank you, Counsel. Mr. Locke. Your Honor, on the search, the arrest and the search issue, there is no evidence in this record, no testimony by anybody that these defendants actually did anything except drive around in a car. And even if they knew what Manuel Valle was doing, they would still not be guilty of a crime. You can knowingly be near where someone else is committing a crime and be not guilty of a crime. And that's the Ninth Circuit case, U.S. v. Herrera-Gonzalez, and it's on page 28 of our brief. And from pages 28 to 33 of our brief, we cite six cases where individuals were doing much more than these defendants and the Ninth Circuit has held that what they were doing was insufficient to show that they were members of a conspiracy. And the fact that the conspiracy involved the conspiracy to manufacture 50 grams of meth, there's no evidence whatsoever that these people ever agreed to do anything. And there's no evidence that they actually ever did anything. They're just there. And if you can be convicted of this, then anybody standing next to somebody committing a crime can be guilty. Or anybody passing by. Or if your brother commits a crime. They weren't just standing there for an instant. They were there before the crime. They were there shortly after the crime. And they followed the other two cars for 20 miles, changing, I think, six different highways. Right. Is that an accident? Well, the brother of Manuel Valle is driving the car. It's his brother. So he's going home with his brother. I mean, that's, you know, they knew each other. They're associates of each other. Yeah. There's no question about that. It's just there's no evidence that these four did anything to participate in the conspiracy. If this could result in a conviction, then kids could be convicted because they're standing next to other kids committing crimes. I'll leave it at that. Okay. Thank you, Your Honor. The other defendants. Oh, that's fine. Go ahead. Thank you. I'll be very quick. First, I want to say on behalf of Mr. Barrera-Medina and Mr. Hernandez, that Mr. Halton filed a Rule 28J letter raising Castro and Blakely. And so those two defendants are the prosecutor indicated that they hadn't made an argument, but they have raised that. Okay. And Mr. Halton is representing those other two defendants? Mr. Barrera-Medina and Mr. Hernandez as well. All right. Very good. As to Bruton, facially incriminating does not mean that the person is named or specified. It means that the statement is incriminating on talks about some incriminating thing without reference to evidence outside the statement. So that a statement that we were going to drop you, we were going to rob you, that's incriminating. That's what facially incriminating means. So in the cases cited by the government, Olano, where the person talked about that he had loans for the defendant to make, but that loans were not necessarily illegal. The person, I think, was a loan officer. Similarly, you had to know the facts outside the case to know that they were talking about illegal loans. In O'Connor, another case cited by the government, said that the co-defendant owed a debt to the speaker, and there was no evidence in that statement that the debt would be paid with drug money. That was a theory that was presented with evidence outside that statement. So in this case, these statements are facially incriminating. That does not mean that the person was named or specified. That is explicitly not the rule under Gray v. Maryland that you don't have to name the person. It can be basically susceptible of interpretation. So that the government's statement that the natural construction, that is not the right standard. Is the person's existence referred to at all? Is there a possibility that someone could find that it referred to their existence? And if there's a plural pronoun or an X or a space, it's the same. Thank you. Thank you, counsel. Anything further? All right, thank you very much. The case just argued quite eloquently on both sides, I might add. We'll be submitted for decision, and the court will adjourn. And given that this is December 7th, we adjourn in the memory of our servicemen and the citizens of Honolulu who fell in the attacks in December 7th, 1941. Thank you. All rise. This court for discussion stands adjourned. Thank you.
judges: O'scannlain, Cowen, Bea